**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ZURICH AMERICAN INSURANCE COMPANY,**
**as subrogee of MICROBAC LABORATORIES,**
**INC.,**

                                        **Plaintiff,**

        **vs.**                                                        **5:21cv374**
                                                                       **(TJM/ATB)**


**NIAGARA MOHAWK POWER CORPORATION,**
**et al.,**
                                        **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

### DECISION & ORDER

        Before the Court is Defendant Niagara Mohawk Power Corporation's ("NIMO")

motion for summary judgment.  <u>See</u> dkt. # 70.  The parties have briefed the issues, and

the Court has determined to decide the matter without oral argument.

### I.    BACKGROUND

        This case concerns a fire that occurred at a facility operated by Microbac

Laboratories in Cortland, New York.  Plaintiff Zurich American Insurance Company

("Zurich"), is subrogated for Microbac, Zurich's insured.  Plaintiff alleges that the fire in

question occurred because of the negligence of Defendant NIMO, which is installed the

electric meter that Plaintiff contends was the source of the fire.  NIMO contends that

Plaintiff lacks proof that any negligence by NIMO caused the fire, and seeks summary

1

judgment.

The fire in question occurred at Microbac's laboratory testing facility in Cortland on September 16, 2018.  Defendant NIMO's statement of material facts ("Defendant's Statement"), dkt. # 70-2, at ¶ 1.[1]  Plaintiff's Complaint alleges that the cause of the fire was "electrical activity in a utility room," and that the fire caused more than $3.7 million in damage.  Id. at ¶¶ 2-3.  The Complaint further alleges that NIMO supplied power to the property where the fire occurred, and had "replaced and/or installed a Sentinel 16S electric meter and panel box" to the property.  Id. at ¶ 4.  The Complaint further raises a negligence claim against NIMO for "improperly installing the subject meter and/or meter cabinet pan."  Id. at ¶ 5.  Plaintiff also sued the maker of the meter, Itron, and the manufacturer of the meter cabinet/pan, ABB.  Id. at ¶¶ 6-7, 9-10.  The Plaintiff sued both these parties, alleging strict liability, negligence, and breach of warranty.  Id. at ¶¶ 7, 10.  Plaintiff stipulated to dismissal against both Itron and ABB after discovery revealed that the products in question were not defective.  Id. at ¶¶ 8, 11; Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Response"), dkt. # 78-1, at ¶¶ 7, 10.  Thus, only Defendant NIMO remains in the case, facing a claim of negligence.

NIMO Service representative Andrew Nagen replaced the electric meter at Microbac on June 18, 2018.  Defendant's Statement at ¶ 12.  Nagen had worked in meter service for NIMO since 2002.  Id. at ¶ 13.  The meter at the Microbac facility was located in a room a the rear of the building.  Id. at ¶ 14.  The rear exit door of that room led to the

---

[1]Defendant filed the statement of material facts with citations to the record required by the Local Rules.  Plaintiff filed a response.  The court will cite to the Defendant's statement for facts which are undisputed and will note where factual disputes exist.

facility's back parking lot and a storage garage.  Id.  Microbac employees went through the

room every day when they went to the parking lot or the garage.  Id.  Microbac stored

tools, filters, and cleaning supplies in the room where the meter was located.  Id.

NIMO replaced the meter because it was not sending a signal to the van that

passed by the building each month to record electrical usage.  Id. at ¶ 15.  Nagen, who

NIMO sent to Microbac to address this problem, noted that the meter's screen was blank

when he arrived.  Id. at ¶ 16.  Installing a meter involves placing the base of the meter into

a socket connected to the customer's electrical system.  Id. at ¶ 17.  NIMO does not

supply the socket, which is part of the building's electrical system and is the property of

the building's owner.  Id.  When Nagen installs a meter, he inspects the socket but does

no repairs.  Id.  He reports any problems to the building's owner.  Id.

Nagen testified that in 2018 he spent about 15-20 percent of his work time on

replacing meters.  Id. at ¶ 18.  He described the typical process of a meter change:

> Walk up, doing a visual.  Look at the meter, the outside of the meter channel, the
> wires.  If I can see the wires, if there's not a conduit.  There is a seal on the meter
> cover, cut the seal open.  Open the lid, take the cover off the meter channel.  Look
> in the meter channel at the wires in there.  Make sure the's no corrosion or melting,
> arcing or anything like that.  I would have my electric gloves on.  Stand off to the
> side and I would pull that meter straight out of the channel, straight out of the
> socket.  I would again visually, like, inspect the back of the meter to make sure
> there was no melting on the back of the meter or discoloration on the blades.  Also
> now I would set the line clips and the lead lines so I can visually inspect them.
> Make sure everything is tight with my hand.  Then install the new meter just by, you
> know, setting it into the socket, into the line clips and pushing it in.

Id. at ¶ 19 (added emphases in quotation removed).

Since the Microbac facility was a commercial one, the procedure that Nagen used

there was "somewhat different."  Id. at ¶ 20.  The meter enclosure contained a "bypass

arm" that allowed electricity to remain available to the customer while Nagen changed out

the meter.  Nagen described this process:

> they have a different type of meter and a different type of meter channel.  So when I open it up, there is a bypass arm in the channel on the right side.  The bypass arm is down and for me to remove the meter, I have to lift the bypass arm up and that opens up the jaws and [I] put a couple of jumpers from line to load so I can work on a commercial service and the customer won't lose power.  When I put the bypass handle up, the customer does not lose power.  I could take the meter out of the channel, the customer still has power.  Then put the new meter in the channel and I drop the bypass arm back down and then the electricity starts going through the electric meter.

Id. at ¶ 20.  Nagen inspects during the change process for evidence of "arcing, melting, or corrosion."  Id.  He records and documents any such findings.  Id.  Nagen testified that he remembered the Microbac job.  Id. at ¶ 21.  He testified that he followed the procedures described above.  Id.  He "inspected the meter socket and observed no evidence of corrosion, arcing, melting, or any other problem."  Id. at ¶ 22.

Other testimony indicated that the original meter and the replacement meters were both Itron 16S Class 200 meters, and that the model used was appropriate for the facility.  Id. at ¶ 23.  The meter that Nagen installed at Microbac had been manufactured and delivered to NIMO in 2004.  Id. at ¶ 24.  The meter had originally been installed in 2005 at a Tops Market in Angola, New York.  Id.  NIMO had removed the meter from the Tops Market on August 10, 2017 because the meter had been selected randomly to be part of the Pick and Test program.  Id. at ¶ 24.  Under this program, New York's Public Service Commission "requires public utilities [to] randomly select a certain percentage of each type of meter in use and test them for accuracy."  Id. at ¶ 25.  A meter fails this test "if there is physical damage to the meter, for example, copper showing on the blades, bent blades, any burning smell, non-functioning display or puncture, or if it is inaccurate."  Id. at ¶ 26.

After the meter was removed from the Tops Market on August 10, 2017, Andrew

Stray, a NIMO employee, received the meter and checked it into the NIMO meter shop on August 22, 2017.  Id. at ¶¶ 27-28.  NIMO employee Mike Cheslik tested the meter on August 24, 2017 as part of the Pick and Test program.  Id. at ¶ 29.  The meter passed.  Id. Cheslik cleaned the meter on December 11, 2017.  Id. at ¶ 30.  NIMO employee Sarah Facteau tested the meter a second time for accuracy on December 15, 2017.  Id. at ¶ 31. The meter then returned to inventory until Nagen installed the meter at Microbac on June 8, 2018.  Id. at ¶ 32.

NIMO employees clean a meter with "a wire brush or scrub pad" that "is used to get the 'grub' off the meter blades[.]" Id. at ¶ 33.  This process is designed "to ensure a clean connection."  Id.  Workers clean the underside of the meter with a cleaning solution.  Id. Workers clean the meter cover with the same solution "so that the customer can see the display panel."  Id.  They do not use the solution on the blades.  Id.  These workers also clean and, if necessary, replace the plastic meter cover.  Id.  The blades of the meter have a tin coating.  Id. at ¶ 34.  If cleaning removes tin and exposes copper on the blades, "the meter is failed."  Id.  The process does not involve "disassembl[ing], modify[ing], refurbish[ing] or alter[ing] the meters."  Id. at ¶ 35.  NIMO does not change the "blades" ("bayonets") during this process.  Id.

Plaintiff disputes that NIMO's process does not involve modifying or refurbishing the meters.  Plaintiff's Response at ¶ 35. Plaintiff contends that NIMO's refurbishing includes cleaning and testing, and that the process can also include using a "wire brush to clean meter blades as part of the cleaning process."  Id.  Plaintiff's expert "has opined that the use of the wire brush if not done carefully could alter the blades and result in a non-spec terminal."  Id.  Plaintiff also points out that NIMO lacks "specifications for how meters are

5

cleaned and [has] no way to ensure consistency in the cleaning process." Id.  While Plaintiff admits that none of the NIMO employees who handled the meter noted any problems in their reports, Plaintiff also points out that NIMO did not take any photographs or otherwise document the condition of the meter between when it left the Tops Market to when it was reinstalled at Microbac.  Id. at ¶ 36.  NIMO trains meter testers, who first begin on residential meters.  Defendant's Statement at ¶ 37.  A promotion to Meter Tester B allows these employees to work on some commercial meters.  Id.  Promotion to Meter Tester C permits them to work on all types of meters.  Id.

The Public Service Commission regulates the NIMO department that monitors its meter testing activities.  Id. at ¶ 38.  No violations have been associated with NIMO's meter testing facility.  Id.  Plaintiff denies that the Public Service Commission sets standards or monitors the NIMO meter department with respect to cleaning and refurbishing meters.  Plaintiff's Response at ¶ 38.  The State of New York issues standards under which the meter lab operates, and labs are audited by the state. Defendant's Statement at ¶ 39.  The State would notify NIMO if the lab were deficient.  Id. Plaintiff points out that the standards do not cover cleaning and refurbishing meters, and do not require that meters examined and tested under the Pick and Test program be returned to service.  Plaintiff's Response at ¶ 39.

NIMO retained Bill Patrick, a forensic electrical consultant, who prepared a report. Defendant's Statement at ¶ 40. The opinion addresses the causes of the fire at Microbac. See Id. at ¶¶ 40-51.  Patrick concludes that:

> Based on all information to date obtained from fire scene visits, laboratory evidence examinations, depositions, various Itron documents, fire dynamics and arc mapping, and product research, it is my opinion to a reasonable degree of

6

engineering certainty, that a failure occurred in the Anchor meter enclosure causing an electrical fire which spread to the Itron electric meter.  The Itron meter was not the cause of this fire.  Furthermore, the actions of National Grid[2] and its employees who tested, cleaned and installed the subject electric meter did not cause and/or contribute to the initiation of this fire.

Id. at ¶ 47.

At his deposition, Patrick stated that a possible cause of the fire was a broken spring found in the meter enclosure, though he could not opine so with "scientific certainty."  Id. at ¶ 50.  Patrick explained the importance of the spring to this possible explanation:

the scenario of the spring dislodging or breaking and pieces falling apart and migrating to a different location from its original location, if it were part of the bypass handle.  And it shorted electrically, it was catastrophic, it was instantaneous, it would be an instantaneous arc fault, whether it was between the phase and ground or between phases.  And it clearly developed into an arc flash, it actually vaporized metal components, it was just not there anymore.  There was no pieces, they were vaporized.  And that event would have taken place in one or two seconds with no pre-warning.  It also, the spring could have broken at an earlier time and just natural vibrations of people in that room maybe bumping into the panel, vibration is what I'm getting at could have dropped it down to an inappropriate spot and caused the event.

Id.  Plaintiff points out that Patrick did not offer this theory in his report.  Plaintiff's Response at ¶ 50.  Patrick also contends that the meter had been cleaned, but not refurbished.  Defendant's Statement at ¶ 51.  Plaintiff disputes this characterization of the work performed on the meter.  Plaintiff's Response at ¶ 51.

Howard DeMatties, Plaintiff's expert, issued a report that offered the opinion that the cause of the fire was meter failure.  Defendant's Statement at ¶ 52.  He found that Nagen had installed an improper meter.  Id.  In the end, however, DeMatties concluded

---

[2]Patrick's Report uses "National Grid" to describe Defendant NIMO.

that "[d]ue to the significant amount of damage to the meter components and incomplete remains, the initiating factor cannot be determined." Id. Plaintiff responds that DeMatties's report relied on inaccurate information from Itron about the meter. Plaintiff's Response at ¶ 52. Because of this inaccurate information about the size of the meter installed "DeMatties could not rule out the installation of an improperly sized meter as the initiating factor causing the fire." Id. Plaintiff insists that when DeMatties received proper information about the meter involved, he "corrected his report and withdrew his opinion that the meter was improperly rated for the installation." Id. DeMatties also pointed to the fact that the meter was used and approximately fourteen years old and had been refurbished and perhaps damaged before being put back into service as "additional factors" that may have contributed to the fire. Defendant's Statement at ¶ 53.

DeMatties's second report acknowledged that the meter installed at Microbac had been proper for the facility. Id. at ¶ 54. At his deposition, DeMatties admitted that the only information that had changed between the time of his initial report and his second report had been the information he received that the meter was proper for the facility. Id. at ¶ 55. Still, he testified that the cause of the fire had to do with the electrical connection at the meter. Id. He testified that "I believe that the initiating factor, because we removed the factor of the underrated meter, once that initiating, which I said in my supplemental report, once that factor is removed, then the only thing left, which is part of the scientific method, the only thing left would be the connection at the terminals. The blades." Id. He further testified that the meter had been refurbished, but could only point to the possibility that the blades had been cleaned by a wire brush or scrub pad. Id.

In his testimony, DeMatties repeatedly stated that the meter was fourteen years old,

8

and claimed that the meter had been refurbished.  Id. at ¶ 56.  The only "refurbishment"

that DeMatties could point to in his testimony, however, consisted fo "the possibility that

the blades had been cleaned with a wire brush or scrub pad."  Id.  DeMatties also pointed

out that the meter was fourteen years old when installed at Microbac, but he did not claim

"that fourteen year old meters should be discarded or that meters start fires when they are

fourteen years old."  Id. at ¶ 57.  Plaintiff responds that this statement "mischaracterizes"

the cited testimony.  Plaintiff's Response at ¶ 57.  Plaintiff cites to several pages of

testimony in claiming that Defendant mischaracterizes the testimony, but makes no effort

to explain how the testimony should be characterized.  Id.  Defendant points out that

DeMatties testified that the fact that a meter installed in one location had been in use at

another location "has no bearing" on whether the meter caused a fire.  Defendant's

Statement at ¶ 58.  Plaintiff contends that DeMatties opinion that an improperly

refurbished meter could cause a fire, and alleges that "the refurbished meter was [the]

only new component installed in a system which had operated without issues for an

extended period of time and that was one of the factors he relied on in reaching his

conclusion."  Plaintiff's Statement at ¶ 58.

DeMatties testified about the cleaning process for the refurbished meter.

Defendant's Statement at ¶ 59.  He contended that "'they are cleaning it with wire brush

and abrasive pad, obviously because it's not, it doesn't look like it's supposed to, there is

material on that.'"  Id.  DeMatties admitted, after seeing the testimony of Cody Doyle, that

the blades received cleaning only "if necessary."  Id. at ¶ 60.  Plaintiff agrees that

Dematties so testified, but adds that NIMO admitted in interrogatory answers that the

meter in question had been cleaned on December 11, 2017, and that such typically

included use of a wire brush on the blades and underside of the meter to clean connections.  Plaintiff's Response at ¶ 60.

DeMatties testified that he thought the blades could have been damaged in cleaning or might contain corrosion if the blades had not been cleaned, and that one of those issues might have caused the fire.  Defendant's Statement at ¶ 61.  DeMatties admitted that he did not know if the blades had any corrosion on them after cleaning and before placement at Microbac.  Id. at ¶ 62.  Plaintiff points out that such information does not exist because "NIMO does not take any pictures or have any records relating to what is done to clean individual meters."  Plaintiff's Response at ¶ 62.  While DeMatties agreed that NIMO's stated practice is to not put a meter back into service when any copper shows through the tin on the blade after cleaning, he contended that putting such meters back in service was possible, due to human error.  Defendant's Statement at ¶ 63.

DeMatties also testified that he had used Nagen's testimony to exclude the possibility that a problem with the socket had caused the fire.  Id. at ¶ 64.  Nagen had testified that he inspected the socket and saw no visible problem.  Id.  Plaintiff points out that DeMatties also based his conclusion on the fact that the socket had been in use for 27 years and had no problems until installation of the refurbished meter.  Plaintiff's Response at ¶ 64.  DeMatties also testified that a problem with the meter socket might have created a loose connection that caused resistive heating and started the firm, though he did not think that likely.  Defendant's Statement at ¶ 65.  Plaintiff points out that DeMatties testified that a damaged blade was more likely the cause of the fire.  Plaintiff's Response at ¶ 65.  DeMatties also testified that Nagen did not know the meter he installed was used, and "might have done 'less of a thorough inspection of it.'" Defendant's

Statement at ¶ 66.  As such, DeMatties concluded, his testimony that he inspected the

meter and did not see any problems was less significant than his testimony that he found

no problems with the socket.  Id.[3]

DeMatties also testified about another potential cause of the fire, "a broken spring

inside the meter enclosure."  Id. at ¶ 68.  He admitted that this broken spiring "could have

been an 'initiating factor in the fire."  Id.  Plaintiff disputes that this admission offers any

clear explanation of the cause of the fire, and "[h]e admitted only that an extremely remote

hypothetical scenario which was raised by defendant for the first time during his deposition

was theoretically possible."  Plaintiff's Response at ¶ 68.  Indeed, Plaintiff claims,

DeMatties testified that he could not state that the spring was an initiating factor for the

fire.  Id.[4]

Plaintiff's Complaint, filed April 1, 2021, raised claims against NIMO, Itron, Inc., and

---

[3]Defendant offers a summary of DeMatties's testimony, in response to which Plaintiff points out that such a summary is not a fact.  See Defendant's Statement at ¶ 67; Plaintiff's Response at ¶ 67.  The Court agrees that the summary does not point to a particular fact.  In any case, Defendant contends that:

in the testimony summarized above, Mr. DeMatties claimed that some unknown act of NIMO must have caused the fire.  If the blades were cleaned with a wire brush, that caused the fire.  If they were not, then corrosion was the cause of the fire.  It might have been an inadequate inspection of the installed meter by Mr. Nagen that caused the fire.  He did not offer an opinion regarding what act of NIMO employees caused the fire.  He identified several possibilities and stated that he believed one of them did.

Defendant's Statement at ¶ 67.

[4]Plaintiff adds a "counterstatement of material facts" to its response.  Defendant does not respond to those alleged facts.  The Local Rules do not require a response to such a statement.  The Court will use the record evidence Plaintiff provides where necessary to the Court's opinion.

ABB Installation Products.  After discovery, the parties stipulated to dismissal of the case against Itron and ABB, leaving only NIMO as a defendant.  Those stipulations leave a negligence claim against NIMO as the only cause of action remaining in the case.  That count is the subject of NIMO's motion for summary judgment, which the parties have briefed.

## II.    LEGAL STANDARD

The Defendant seeks summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly

supported motion for summary judgment may not rest upon "mere allegations or denials"

asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d

Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v.

Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

III.   **ANALYSIS**

Defendant seeks summary judgment on several bases, which the Court will

address in turn, as necessary.

A.     **Negligence Standard**

Plaintiff's claim here sounds in negligence.  In New York, a plaintiff offers prima

facie evidence of negligence when he shows that "(1) the defendant owed the plaintiff a

cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered

damage as a proximate result." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d

112,116 (2d Cir. 2006).

B.     **Standard of Care**

Defendant first argues that Plaintiff has failed to produce expert evidence of the

standard of care that Defendant allegedly failed to meet.  Because this case is a technical

matter beyond the ken of an ordinary juror, Defendant claims, that failing is fatal to the

claim.  Defendant argues that "[t]he ordinary juror has no experience with which to

conclude that electric utilities should or should not clean the blades of  electric meters with

wire brushes.  The absence of testimony of a standard of care in this care [sic] is

especially a problem because the plaintiff's expert's opinion regarding the cause of the fire

is so indefinitie."  Despite a lack of evidence about the condition of the blades, "DeMatties

13

speculated at great length about the possible conditions of the meter blades but he did not offer any opinion on a standard of care applicable to an electric utility to prevent those conditions he thought possible."

In response, Plaintiff does not address directly the issue of whether Plaintiff has put forth evidence of the standard of care which NIMO allegedly breached.  Plaintiff argues that its "claims are for NIMO's negligence in installing a refurbished meter in a dangerous condition at Microbac's facility and that such negligence caused the Fire."  Plaintiff focuses on its claim that Defendant breached a duty of care by installing a meter that had been refurbished after being removed from another facility: "[w]hen NIMO made the decision to refurbish the Meter and put it back into circulation, NIMO had a duty to ensure that the refurbished Meter installed at the Microbac facility was in a safe condition."  Plaintiff contends that the meter in question had worked in the previous facility where it operated. After refurbishing, a fire broke out where the meter had been installed after three months. The facility where NIMO placed the refurbished meter had operated for 27 years without any incidents, and NIMO employees were the only persons who did any work around the area where the fire started after installation of the refurbished meter.  Moreover, Plaintiff's expert testified that the Defendant had no protocol or specifications for how meters should be refurbished and keeps no records on the process, which would permit a meter that was damaged during refurbishment to be put back into service.  Circumstantial evidence indicates that the "[f]ire started in the meter channel in the area where the Meter blades, which had been cleaned by NIMO with a wire brush, connected into the socket."

In reply, Defendant points out that Plaintiff's response does not really address the standard of care applicable in this matter, but instead focuses on causation, which is only

14

one element of a negligence claim.  Testimony about the fire starting at the blades does not, without more, show a breach of the standard of care.  Defendant argues that Plaintiff's "expert provided extensive speculation regarding what NIMO may have done that could have caused the fire.  He never testified that any of those things would not have been done by a reasonably prudent electric utility."  Failing to provide evidence that NIMO did "something that a reasonably prudent utility would not do" does not provide evidence of the standard of care, Defendant claims, and the Court should grant summary judgment on this basis.

The Court agrees that in New York "[e]xpert testimony is necessary to prove a deviation from accepted standards of care and establish proximate cause 'unless the matter is one which is within the experience and observation of the ordinary juror.'" Ivory v. International Bus. Machines Corp., 116 A.D.3d 121, 127 (3d Dept. 2014) (quoting Lyons v. McCauley, 252 AD2d 516, 517 (2d Dept. N.Y. 1998)).  In cases like medical malpractice actions, "[e]xpert testimony is a necessary part of" the proof, "as the plaintiff is required to establish the relevant professional standard of care." Martuscello v. Jensen, 134 A.D.3d 4, 12 (3d Dept. 2015).  At the same time, in New York, "'[e]xcept for malpractice cases (against a doctor, dentist, etc.) there is no general rule or policy *requiring* expert testimony as to the standard of care, and this is true even in the increasingly broad area wherein expert opinion will be received.'" Stagl v. Delta Airlines, 52 F.3d 463, 473 n.6 (2d Cir. 1995)(quoting Harper & James § 17.1, at 547).  "While plaintiffs generally elect to proffer expert testimony to prove proximate causation in civil actions based on fire damages, it is not clear that, as a matter of law, they must." Weber v. Paduano, No. 02 Civ. 3392, 2003 U.S. Dist. LEXIS 21288 at *31 n.6 (S.D.N.Y. Nov. 20, 2003).  "Sometimes, the question

whether one agency as opposed to another caused a fire may well lie 'within the experience and observation of the ordinary jurymen from which they may draw their own conclusion[,] and the facts [may be] of such nature as to require no special knowledge or skill.'" Id. (quoting Meiselman v. Crown Heights Hosp., 285 N.Y. 389, 396 (N.Y. 1941)). "Expert testimony is only necessary if the witness cannot provide evidence of the causation." Faryniarz v. Nike, Inc., No. 00 Civ. 2623, 2002 U.S. Dist. LEXIS 6023 at *5 (S.D.N.Y. Apr. 8, 2002) (citing Jarvis v. Ford Motor Co., 283 F.3d 33, 47 (2d Cir. 2002)).

This case is not a medical malpractice case, and no expert testimony as to the standard of care in the industry for installing a meter in an electrical channel is necessary for the Plaintiff to establish NIMO's duty or the standard of care. An ordinary jury could understand without expert testimony that a utility has a duty to insure that a meter the utility installs does not create a fire risk because of the condition of the meter when installed. While, as will be explained below, the jury would need expert testimony to understand causation for the fire, the Defendant is not entitled to summary judgment just because Plaintiff's expert did not provide explicit testimony on the standard of care under these circumstances. The Plaintiff will need to prove that NIMO's installation of the meter was negligent and that the negligence caused the fire, but the proof of Defendant's duty here is sufficient to avoid summary judgment. The Court will deny the motion on this basis.

### B.    Proof of Causation

Defendant next argues that Plaintiff has not offered proof that NIMO's negligence caused the fire in question. Here, the focus is on whether Plaintiff has proof that NIMO's installation of the meter in question was a cause of the fire. NIMO argues that

Plaintiff lacks sufficient evidence to make out a circumstantial case that negligence by NIMO caused the fire to start.  Defendant argues that Plaintiff's expert fails to produce sufficient evidence to support a finding that NIMO's negligence caused the fire, and that Plaintiff's expert report is unreliable and inadmissible.  Defendant argues that the expert's report is not reliable because the expert has no basis to reach his conclusion that NIMO did something to actually cause the fire.

The central question in this case is whether Plaintiff has produced sufficient evidence to allow a jury to determine whether Defendant's negligence caused the fire in question.  Both parties produced expert reports to address the issue of causation. Examining those reports in more detail aids the Court in determining whether issues of fact exist which a jury must decide in order to determine whether Defendant's negligence caused the fire in question.

Plaintiff's expert, Howard DeMatties, issued an initial report, followed by a supplemental report.  See Exhs. N and O to Defendant's Motion, dkt. #s 70-17, 70-18. Dematties "perform[ed] a forensic investigation into this fire loss."  Exh. N. at 1.  After examining the site of the fire, the remains of the meter, and a number of other items and documents, DeMatties concluded that "it is the author's opinion, as indicated by witness statements, fire patterns, site examination, laboratory examination and fire dynamics that a failure occurred at the National Grid (NG) meter."  Id. at 2.  DeMatties found that "the [NIMO] employee installed a refurbished 14 year old meter and was the last person to handle the meter and inspect the meter socket shortly before the fire.  An arc fault failure at the meter was the source of ignition for this fire."  Id. at 2-3.  DeMatties further reports that he examined and "reconstruct[ed]" the meter, finding that "the load side terminals

contain localized heating and arc damage." Id. at 4. "All of the interior electronic components of the meter such as the remains of the circuit board and components mounted to the board are heavily damaged and not all components remained." Id. Investigators recovered many of those components "from the debris on the floor below the meter pan." Id.

DeMatties also explained that the meter installed at Microbac was a "Class CL200 meter rated at 200 amps." Id. at 5. "The power service to the building," however, is a 400 amp service (rated at 320 amps continuous), containing main buss fuses rated at 400 amps." Id. "The meter pan" from the meter recovered after the fire "is heavily damaged and contains no identifying information." Id. Thus, DeMatties finds, a NIMO "employee installed a 200 amp (CL200) refurbished 14 year old meter into the 400 amp service. Based on the testimony, the 200 amp meter was underrated for the 400 amp service." Id. The electronics portion of the meter was too damaged for "complete analysis," but "[n]o arc damage or splatter was found in this section of the meter enclosure." Id. at 5-6. Rather, "[t]he concentration of damage is found on all three of the load side terminals, with the most significant arc damage to the A and B phase terminals." Id. at 6. "No arc damage as observed on the Neutral pickup terminal; however, the cotter pin is damaged. This terminal bayonet (blade) remained connected to the socket." Id. DeMatties points out that "[a]s part of the meter refurbishment by" Defendant, "the terminals or blades are cleaned with a wire brush. There does not appear to be any specification associated with the level of wire brush application to clean the terminals." Id. DeMatties concludes that "[t]he damage to the meter socket remains was consistent with an arcing fault at the meter. Arc damage was found on the load side socket remains as well as portions of the

bypass mechanism and buss bars." Id. DeMatties further noted that "[t]he load side cables from the meter socket exited the bottom right of the meter pan and into the 3 phase distribution panel." Id. He found no damage to any of the "wiring, components or enclosures beyond that found in the meter box." Id.

DeMatties finds that "there is evidence of a failure at the meter. Significant arc damage found on the A and B phase load side meter terminals is found. Due to the significant amount of damage to the meter components and incomplete remains, the initiating factor cannot be determined. However, the evidence indicates that a [sic] improperly rated, refurbished meter rated at 200 amps was installed into a 400 amp (320 amp continuous service." Id.

DeMatties also finds other "[a]dditional factors" in the fire. Id. at 7. He points to the age of the meter–approximately fourteen years–and the fact that the meter had been refurbished. Id. DeMatties finds that "[t]he terminals or blades may have contained damage" because the refurbishment process "includes applying a wire brush to clean the terminals. The terminals are plated, and the plating may have contained damage." Id. Whether damage occurred depends on several factors, including: the "amount of corrosion on the terminals prior to wire brushing"; whether the wire brush was steel or brass; "the aggressiveness of the wire brushing"; whether the tool used for the brushing was "motorized or manual"; and the length of time used for the brushing. Id. DeMatties also points to the conduct of the NIMO employee who installed the meter. Id. He contends that Nagen did not testify that tested "for proper Source Voltage appropriate to the meter classification to ensure safe operation and billing accuracy" as required by NIMO's instructions for meter exchanges. Id.

19

DeMatties further reports that Nagen testified that he "examined the meter socket at the time he replaced the meter socket" and found "no indications of a failing meter socket." Id. at 8.  If the meter socket had been "compromised," DeMatties finds, Nagen would have seen "discolored insulating materials and annealed and discolored metal socket components."  Id.  Nagen's inspection saw no such issues, and DeMatties concludes that "[t]his testimony goes to ruling out the meter socket and the only new component was the newly installed, refurbished, and improperly rated Itron meter."  Id.  Further, DeMatties points out, Defendant "owned the meter, refurbished the meter, inspected the meter socket, and installed the meter less than three months prior to the fire.  The evidence indicates that a failure occurred at the meter.  The most likely cause of this failure was due to an improperly rated, used meter installed into the power system at the Microbac facility that initiated an arc fault within the meter pan."  Id. at 9.[5]

DeMatties also issued a supplemental and rebuttal report.  See Exh. O to Defendant's Motion, dkt. # 70-18.  DeMatties reports that "[b]ased on incorrect information and exemplar meters initially submitted by Itron and National Grid, the author concluded that the Itron meter that was installed at the time of the loss was underrated."  Id. at 2. The new information provided, however, showed that "the Itron meter installed at the time

_____

[5]DeMatties further notes that:

testing conducted on the [NIMO] transformer indicates an out-of-range measurement that would prevent the transformer from being put back into service; however, it does not have any bearing on the failure at the meter.  There is no testimonial evidence of a loose neutral, brightening or dimming of lights, or other power anomalies prior to the fire.  There is no evidence of an overloading condition of the facility and the power distribution system was properly rated.

Dkt. # 70-17 at 9.

of the fire was properly rated for installation at the Microbac facility." Id.

Defendant produced an expert report from William Patrick, Jr., a forensic electrical consultant. See Exh. L to Defendant's Motion, dkt. # 70-15. Patrick disputes DeMatties's conclusions about the effect of refurbishing on the meter's blades. Id. at 37. He points to the testimony of Cody Doyle, Engineering Manager of Lab and Test for NIMO. Id. Doyle testified that NIMO uses a wire brush "to get the grub off the meter blades, so we have a clean connection." Id. Doyle further stated that employees look "for any copper in the blades" and fail the meter on inspection if any copper appears. Id. Patrick states that "[t]he presence of copper on the bayonet terminals indicates the silver-colored plating has been damaged or compromised and that meter would be an automatic failure." Id. In addition to using a brush to clean the meter blades, Patrick reports, Doyle testified that "[c]leaning of the meter also involves visual inspection of the external portions of the meter." Id. Had this visual inspection revealed any copper color on the bayonet terminals, "the meter would have failed inspection." Patrick finds that "[c]leaning of the meter as part of the 'Pick for Testing' program has no impact on the functionality of the meter and the subject meter was not the cause of the fire." Id. Moreover, Patrick states that no Microbac employee testified to seeing "flickering, brightening, or dimming of lights in the building," which "could indicate a poor electrical connection in the meter enclosure or other areas of the electrical service." Id. at 38.

Patrick disputes DeMatties's finding that "'[t]he damage to the meter socket remains was consistent with an electrical fault at the meter. Arc damage was found on the load side socket remains as well as portions of the bypass mechanism and buss bars.'" Id. at 38. Patrick finds that:

21

This statement is incorrect.  The electrical arcing damage described in his statement all occurred on the meter enclosure side of the meter base/barrier.  Only a minor amount of electrical activity was found on two of the bayonet terminals of the meter base that extended slightly into the interior of the meter . . . His statement confirms that this fire started within the meter enclosure and spread to the Itron meter interior.  No electrical arcing activity was found in the meter components.  The reason no electrical activity was found in the meter components is that the electrical arcing activity that started this fire within the meter enclosure caused the three 400 ampere fuses to open which shut off all power to the meter.  Mr. DeMatties [sic] report does not discuss any electrical arcing activity being found in the meter internal components.

Id.  In the end, Patrick finds, the fire occurred because "a failure occurred in the Anchor

meter enclosure causing an electrical fire which spread to the Itron electric meter."  Id. at

39.  The meter did not cause the fire.  Nor, Patrick finds, did "the actions of [NIMO] and its

employees who tested, cleaned and installed the subject electric meter[.]"  Id.

In this case, a fire began in an area where Defendant NIMO had installed a new

electrical meter three months previously.  The parties here agree that no one has

produced direct evidence of the cause of the fire.  A jury deciding on this claim would be

forced to rely on inference and circumstantial evidence.  "In the absence of 'direct'

evidence of causation, New York courts consider three factors in deciding whether a

factfinder can conclude that a defendant's negligence caused the accident."  Union Mut.

Fire Ins. Co. v. Ace Carribean Mkt., 64 F.4th 441, 445 (2d Cir. 2023) (quoting Estate of

Gustafson ex rel. Reginella v. Target Corp., 819 F.3d 673, 675 (2d Cir. 2016)).  Those

factors are:

"First, was there evidence of negligence or a defect on defendant's part, and if there was, did that negligence or defect increase the chances of plaintiff's injury occurring, and by how much?  That is, how strong was the circumstantial evidence of causation?"  Reginella, 819 F.3d at 675.  "Second, which party is better placed to tell us whether the negligence or defect was in fact likely to be a cause of the injury or whether the injury would have happened regardless of the negligence or defect?"  Id. at 676.  "And third, has the relevant jurisdiction . . . indicated a preference in

22

favor of or against liability in the given context?"

Id.

Both parties address this standard.  Defendant argues that the first two factors do not weigh in favor of finding liability for NIMO.  NIMO is not better placed than the Plaintiff to determine the cause of the fire.  The fire occurred in a facility that Microbac and Microbac's employees used, and inside a meter enclosure and at the intersection between the meter and the meter socket.  NIMO was not better placed than Microbac to determine the cause of the fire.  Likewise, Defendant claims, New York has not stated a preference for liability in favor of a subrogated insurance company in this context.  As to the strength of the circumstantial evidence in support of Plaintiff's claim, Defendant argues that Plaintiff has failed to produce any actual evidence of defect in the meter blades, and that the presence of a broken steel spring in the meter enclosure provides another potential cause of the fire that Plaintiff's expert cannot exclude as a cause.  Defendant also argues that the doctrine of *res ipsa loquitur* does not save Plaintiff's claim, since Plaintiff has not produced any proof that the fire was caused by an instrumentality within NIMO's control.[6] Plaintiff's expert report does not help, Defendant claims, because the expert does not have any reliable basis for concluding that NIMO's conduct caused the fire.

Plaintiff argues that both direct and circumstantial evidence of NIMO's negligence exists.  Direct physical evidence exists that the fire started in the socket of the meter channel in the area where the blades plugged into the socket.  Each party's expert agrees that the fire started in that area.  As to the first factor, Plaintiff argues that strong

---

[6]Plaintiff does not argue that the doctrine of *res ipsa loquitur* applies to this matter.

circumstantial evidence that the fire started "as a result of NIMO installing the Meter that had been compromised during NIMO's refurbishment process." The meter had been used at the Tops market for twelve years without any problems, and then had been removed and cleaned by NIMO using a process that included using a wire brush on the blades. When Nagen installed the meter at Microbac he examined the meter that had previously been in place at the facility and saw no damage or evidence arcing, corrosion, or melting. The meter channel at that facility had operated without issue for 27 years and the original meter had no problems for ten years. The meter was in place and not tampered with for three months, and then a fire occurred. As to the second factor, Plaintiff contends that NIMO had exclusive control over refurbishing the meter and installing the meter at Microbac. As to the third factor, Plaintiff argues that "New York has a preference for holding utilities liable for their negligence that causes harm to customers or the public while providing electrical service as distinguished from damages caused by an interruption of such service."

The Court will first address the second and third factors in the test articulated above. These two factors are not significant to the Court's determination here. As to the second factor, that factor is not decisive either way. To the extent that the fire was caused by the meter, NIMO had control over refurbishment and installation of that meter and was better placed than Microbac to notice any faults in the meter. At the same time, Microbac had control over the room where the fire occurred three months after the meter's installation and was better placed to notice any defects in the meter's operation or other problems in the area where the fire started. Thus, if this factor weighs towards either party at all, it weighs slightly towards the Plaintiff, since Defendant last handled and examined

24

the meter in question.  As to the third factor, the Court notes that "New York has not indicated a preference in favor of or against liability in this context.  New York courts have upheld insurers' equitable subrogation claims against third-party tortfeasors, but have also articulated anti-subrogation rules to spread costs through insurance companies rather than concentrate them." Ace Caribbean Mkt., 64 F.4th at 445-46.  Thus, this factor does not weigh in either direction.  Thus, as to the second and third factors, the Court finds that they weigh slightly in favor of the Plaintiff's position, but are not centrally important to the outcome of the matter.

The causation issue here thus comes down to the strength of the circumstantial evidence that shows negligence on NIMO's part.  Courts in New York have concluded that circumstantial evidence supports a finding of negligence "if there is a strong link between (1) an activity considered wrongful because it increases the risk that a particular type of harm would occur and (2) the occurrence of that type of harm." Id. at 447.  "For this causal link to be made out, however, there must be sufficient evidence of negligence on the part of the defendant that increased the chances of the harm that occurred." Id. "Although plaintiff's proof need not 'positively exclude every other possible cause of the accident but defendant's negligence,' plaintiff is required to render those other causes sufficiently 'remote' or 'technical' so that the jury may reach its verdict based on logical inferences to be drawn from the evidence, not upon speculation." St. Paul Mercury Ins. Co. v. Pepsi-Cola Bottling Co. of N.Y., Inc., No. CV-04-360, 2007 U.S. Dist. LEXIS 56884, at *21 (E.D.N.Y. Aug. 2, 2007) (quoting Schenider v. Kings Highway Hosp. Ctr., Inc., 67 N.Y.2d 743, 744 (N.Y. 1986)).

Further, in New York:

"Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury." (*Ingersoll v. Liberty Bank*, 278 N.Y. 1, 7; *see Feblot v. New York Times Co.*, 32 NY2d at 498, citing *Digelormo v. Weill*, 260 NY 192, 199-200; *see also Schneider v. Kings Highway Hosp. Center*, 67 NY2d 743, 745). If "there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for the defendant was responsible." (*Digelormo v. Weil*, 260 NY, at 200, ). Thus, to support the jury's verdict, the evidence—viewed in the light most favorable to plaintiff–must support plaintiff's view of the cause of the injury over the opposing view (*see, Ingersoll v. Liberty Bank*, 278 NY, at 7 ). Plaintiff need not refute remote possibilities; it is enough for plaintiff to show facts and conditions from which the negligence of defendant may be reasonably inferred (*see, Negri v. Stop & Shop*, 65 NY2d 625, 626 ; *Spett v. President Monroe Bldg. & Mfg. Corp.*, 19 NY2d 203, 205; *Dillon v. Rockaway Beach Hosp.*, 284 NY 176, 179).

Berstein v. New York, 69 N.Y. 1020, 1022 (1987). A plaintiff's burden "is satisfied if the possibility of another explanation for the event is sufficiently remote or technical 'to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence.'" Burgos v. Aqueduct Realty Corp., 92 N.Y.2d 544, 550 (N.Y. 1998). (quoting Schneider v. Kings Highway Hosp. Ctr., 67 N.Y. 2d 743, 744 (N.Y. 1998)).

The Court finds that Plaintiff has not presented sufficient evidence of negligence by Defendant NIMO to meet its burden to prove the case by circumstantial evidence. As explained above, Plaintiff's expert's evidence of NIMO's negligence is purely speculative, particularly after DeMatties's initial theory that Defendant installed an improperly rated meter at the Mircrobac facility proved untenable.[7] Plaintiff's theory is now that the fire may

---

[7]Defendant argues that Plaintiff's expert report is not admissible pursuant to Federal Rule of Civil Procedure 702 and should not be considered by the Court. The Court finds that, even when considering the expert testimony, Plaintiff has not produced evidence sufficient to withstand summary judgment. The expert report Plaintiff produced does not offer any evidence beyond speculation about NIMO's negligence.

have started due to the process that Defendant used to refurbish the meter, but the

evidence in the case indicates only that Defendant refurbished the meter by some means,

and Plaintiff admits that no evidence indicates the method used on the meter in question.

No evidence indicates that the meter that Defendant installed had any defects after

refurbishing.  Plaintiff's expert contends that the method of cleaning could create

dangerous defects, but does not contend that the method is always dangerous. Without

any evidence of the actual condition of the meter in question, the jury would be forced to

speculate that the fire would most likely have started only because of the way that

Defendant refurbished meters,[8] and not because of some other equally likely cause.

Defendant's expert offers another likely cause that is no more remote than Plaintiff's claim.

Under those circumstances, Plaintiff has not offered sufficient evidence to show that "the

possibility of another explanation for the event is sufficiently remote or technical 'to enable

the jury to reach its verdict based not upon speculation, but upon the logical inferences to

be drawn from the evidence.'"  Burgos, 92 N.Y.2d at 550.

     The Court agrees with the Defendant that this case is like Union Mut. Fire Ins. Co.

v. Ace Carribean Mkt., 64 F.4th 441 (2d Cir. 2023).  In that case, a fire started in a market

late in the evening when the store was unoccupied.  Id. at 444.  The fire caused a great

deal of damage to the market and surrounding buildings.  Id.  Plaintiff, subrogated to its

insureds, paid out substantial damages due to the fire.  Id.  The fire marshal investigated,

finding "a V-shaped burn pattern, as well as heavily damaged power strips and extension

cords, in the rear of Ace Caribbean Market."  Id.  While the report indicted an extension

_____

     [8]The only evidence in the case indicates that when the meter installer examined the
meter, he saw no visible defects.

cord as the cause of the fire, the report also "explained that the cause was 'not fully

ascertained due to structural collapse'" from the roof and second flood of the building.  Id.

"While extension cords that are plugged into each other could overheat and start a fire,"

the investigation did not find "any evidence of misuse or overload."  Id.  Investigators also

acknowledged that manufacturing defects in the cords could have existed.  Id.  Thus,

"while [an investigator] believed that the extension cords were the probable cause of the

fire, he could not make the determination with certainty."  Id.  The investigator "was

confident that the fire *originated* in the rear of Ace Caribbean Market where the extension

cords were found, but was not sure as to its cause."  Id. (emphasis in original).  After the

insurer filed suit, defendants produced two expert reports, neither of whom could

determine the source of the fire.  Id.  The insurer hired an expert, but did not "identify him

as a witness or produce any report from him in the district court."  Id.

        Plaintiff appealed after the district court granted summary judgment to the

defendant.  Id. at 445.  The Court of Appeals explained New York negligence law,

concluding that "[c]ircumstantial evidence is therefore enough if there is a strong link

between (1) an activity considered wrongful because it increases the risk that a particular

type of harm would occur and (2) the occurrence of that type of harm."  Id. at 447.  "For

this causal link" to exist, the court emphasized, "there must be sufficient evidence of

negligence on the part of the defendant that increased the chances of the harm that

occurred."  Id.

        The Court of Appeals pointed out that plaintiff relied on the inconclusive fire

marshal's report "and testimonies that the fire originated in the extension cords located in

the rear of Ace Caribbean Market, and that overloaded extension cords can overheat and

28

cause fires" as evidence of negligence. Id.  At the same time, however, the Court noted that fire marshals "were more confident about the fire's origin than its exact cause" and that "defendants' experts both concluded that defendants' actions did not contribute to the fire." Id.  Thus, the Court concluded, plaintiff "therefore produced weak circumstantial evidence that something wrong with the extension cords caused the fire." Id.  Even accepting such weak evidence, however, plaintiff "showed no evidence whatsoever on defendants' part, and evidence of causation by itself is not evidence of negligence." Id.  Plaintiff therefore had failed to make out a negligence case based on circumstantial evidence.

The facts are similar here.  As in Ace Carribean Market, the circumstantial evidence of negligence is exceedingly weak.  While the evidence indicates that the fire started in the meter enclosure is strong, evidence of what in particular caused the fire is inconclusive at best.  Plaintiff's expert offers mere speculation as to the cause, pointing to the possibility that Defendant may have improperly cleaned meter blades without any evidence about the cleaning of the blades in question or the condition of the meter when installed.  Thus, as in Ace Carribean, Plaintiff here has produced evidence of the origin of the fire, but has not produced actual evidence of negligence that led the fire to originate in that space.[9] Plaintiff has not produced actual evidence of NIMO's negligence with reference to the refurbishment and installation of the meter in question.

The Court must therefore find that Plaintiff has not produced sufficient evidence that NIMO's negligence was the cause of the fire.  The Court will therefore grant the

---

[9]Unlike Ace Caribbean, the reports from the fire examiners in this case do not even agree that the fire originated in a particular object.

29

Defendant's motion.


## IV.     CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment, dkt. #

70, is hereby **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.


**IT IS SO ORDERED.**


**Dated:** November 29. 2023

Thomas J. McAvoy
Senior, U.S. District Judge